UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| DAMON L. WARD, | Civil No. 11-1752 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF MINNEAPOLIS, SHAWN KELLY, AARON MORRISON, LONNIE HOFFBECK, CHENG CHANG, MELINDA J. OLSON, and TIM DOLAN, | |
| Defendants. | |

Albert T. Goins, Sr., **GOINS LAW OFFICES, LTD.**, 378 Grain Exchange Building, 301 Fourth Avenue, Suite 378, Minneapolis, MN 55415, for plaintiff.

Gregory P. Sautter and Timothy S. Skarda, Assistant City Attorneys, **MINNEAPOLIS CITY ATTORNEY'S OFFICE**, 350 South Fifth Street, Room 210, Minneapolis, MN 55415, for defendants.

Plaintiff Damon Lee Ward brings a number of claims against five Minneapolis police officers (Shawn Kelly, Aaron Morrison, Lonnie Hoffbeck, Cheng Chang, and Melinda Olson), former Minneapolis Chief of Police Tim Dolan, and the City of Minneapolis. The claims arise from a traffic stop and temporary detention that occurred in Ward's driveway. Presently before the Court is defendants' joint motion for summary judgment on all of Ward's claims. Ward conceded a number of his claims at oral

argument,[1] and his remaining claims are (1) a 42 U.S.C. § 1983 claim against the individual officers for Fourth Amendment violations, (2) claims for failure to prevent constitutional violations brought pursuant to 42 U.S.C. §§ 1983 and 1986; and (3) state tort claims for assault, battery, false arrest, intentional infliction of emotional distress, and negligent infliction of emotional distress. Although the circumstances of the traffic stop were unfortunate, the Court finds that the officers are entitled to qualified immunity on the federal claims and official immunity on the state claims. Thus, the Court will grant defendants' motion for summary judgment in its entirety.

## BACKGROUND

Plaintiff Damon Lee Ward is an African-American attorney admitted to the Minnesota bar. (Notice of Removal, Ex. 1 (Summons and Complaint ("Compl.") ¶ 3), July 1, 2011, Docket No. 1.) On June 16, 2009, Ward was driving near his home in his Mercedes-Benz sedan. (Aff. of Gregory Sautter, Ex. 1 (Dep. of Shawn Kelly ("Kelly Dep.") 7:8-11, 33:12-15), Sept. 28, 2012, Docket No. 15.) Kelly began following Ward after Ward made a right turn and then moved from the right lane to the middle lane without signaling the lane change. (Sautter Aff., Ex. 2 (Dep. of Damon Ward ("Ward Dep.") 29-30; Kelly Dep. 44:1-4.) Ward claims that he made a wide turn to avoid an obstruction in the right lane. (Ward Dep. 29:9-30:2.) At some point after he noticed

---

[1] Ward conceded his § 1985 conspiracy claim, his *Monell* claim, his claims against Chief Dolan, and his claims against Officers Chang and Olson. Having reviewed the parties' briefing, which occurred prior to Ward's concession, the Court finds that summary judgment would have been appropriate on these claims even if Ward continued to pursue them.

Kelly, Ward called his sister, Cassandra Ward Brown, and told her that an officer was following him. (*Id.* 31:12-17.)

Shortly after Kelly began following Ward, Ward stopped at a T intersection, paused, signaled right, then signaled left, then turned left. (*Id.* 32:6-15; Kelly Dep. 41:8-12.) After another turn, Ward stopped at a stop sign and again signaled in multiple directions. (Ward Dep. 35:10-23; Kelly Dep. 54:5-8.) Ward claims that he was deciding whether to go to the grocery store before going home. (Ward Dep. 32, 35.) At the next stop sign, Ward made an extended stop, (Kelly Dep. 54:24-55:3), then turned right, travelled a short distance, and pulled into the driveway behind his condominium, (Ward Dep. 37:14-22). Kelly pulled up behind Ward's car and activated his lights to initiate a traffic stop. (*Id.* 38:20-23; Kelly Dep. 61:7-8.) Kelly claims that he initiated the stop because Ward failed to signal in advance of each turn and because Ward's erratic signaling made Kelly concerned that Ward was drunk or suffering from a medical condition. (Kelly Dep. 26:12-16.)

Kelly approached Ward's car and knocked on the window. (Ward Dep. 39:8-14.) This occurred at 7:57:07, according to the video taken from Kelly's squad car. (Sautter Aff., Ex. 8 ("Video") at 19:57:07.)[2] Ward opened the window and Kelly asked for his license and proof of insurance. (Ward Dep. 40:3-4, 20-25.) Ward responded that he could not imagine why Kelly stopped him and Kelly again asked for his license. (*Id.* 40:20-41:17.) When Ward again asked why Kelly stopped him, Kelly responded that Ward appeared intoxicated. (*Id.*) The two then argued about whether Ward appeared

---

[2] The traffic stop was recorded but the events preceding it were not.

drunk, and Ward offered to take a breath test or perform sobriety tests, accused Kelly of pulling him over for being a black man in an expensive car, and stated that he could not imagine why else he was pulled over in front of his house.  (*Id.* 42:13-44:7.)  Kelly then explained Ward's erratic signaling and illegal turn and eventually demanded Ward's license again.  (*Id.*)

Ward claims that as he leaned to get his wallet, Kelly moved his hands toward his holster and Ward threw his hands up to show them to Kelly.  (*Id.* 44.)  Ward claims that Kelly then reached through the open window to pull him out of the car.  (*Id.* 43-44.)  The video shows that Kelly did reach into the car and try to pull the door open nearly two minutes after initially knocking on the window.  (Video at 19:59:02.)  The video also shows Ward momentarily holding the door shut, but then letting go and allowing Kelly to pull the door open.  (*Id.*)  At this point, Ward began yelling loudly for help.  (Ward Dep. 44-45.)  Kelly repeatedly ordered Ward to exit his vehicle and the video shows him gesturing for Ward to do so multiple times during a span of close to two minutes.  (Video at 19:59:10-20:00:51; Kelly Dep. 70.)  Ward claims to have an indistinct memory of Kelly muttering a racial epithet as he was pulling the door open or afterward when he was gesturing for Ward to get out of the car.  (Ward Dep. 45.)

At some point, Kelly had called for backup, (Kelly Dep. 34:3), and at 8:00:59, Morrison and Hoffbeck arrived.  (Video at 20:00:59.)  Ward was still in his car yelling loudly for help.  (Sautter Aff., Ex. 4 (Dep. of Aaron Morrison ("Morrison Dep.") 30-31).)  Morrison walked to the driver's side and stood behind Kelly and Hoffbeck walked to the

passenger's side. (Video at 20:00:59-20:01:05.) Seconds later, Officers Cheng and Olson arrived as well. (*Id.*)

At 8:01:47, several minutes after initially opening his window, Ward exited his vehicle. (*Id.* at 20:01:47.) Ward claims that he put his arms out as he exited the car and he was pulled out, aggravating prior shoulder injuries. (Ward Dep. 52, 54-55.) Because the view of the driver's side is obscured by the other officers, it is unclear exactly how forcefully, if at all, Kelly pulled on Ward's arms as Ward exited his vehicle. (Video at 20:01:47.) As Ward briefly stood by his driver's side with Kelly holding him under his arms from behind, Morrison yelled at Ward and told him to quit acting like a baby because this was a simple traffic stop. (Morrison Dep. 69.) Ward asked Morrison, "Is this the part where you Taser me?" (Ward Dep. 56:6-9.) Kelly then guided Ward toward the rear right fender of Ward's vehicle, where Kelly and Hoffbeck handcuffed him. (Video at 20:01:50-20:02:10.) After securing Ward's handcuffs, Kelly patted down Ward and removed Ward's wallet from his pocket before Kelly and Hoffbeck escorted Ward to the back of Kelly's squad car. (*Id.* at 20:02:14-20:02:59.)

Ward's sister arrived at some point during the stop and observed Ward standing outside of the car. (Sautter Aff., Ex. 3 (Dep. of Cassandra Ward Brown ("Brown Dep.") 26).) The officers placed her under arrest and spent a significant time interacting with her while Ward was in the back of Kelly's squad car. (*Id.* 33-34.) Ms. Brown brought a separate action related to this event and that action settled without an admission of liability. (Sautter Aff., Ex. 9.)

Kelly returned to his squad car at 8:27:10 with a citation for Ward. (Video at 20:27:10.) As Kelly explained the citation, Ward accused Kelly of lying and called him, among other things, a racist and a redneck. (*Id.* 20:27:15-20:29:00.) When Kelly released Ward, Ward told Kelly his foot was stuck and asked for help getting out of the car, which Kelly offered. (*Id.* at 20:29:05-20:30:42; Ward Dep. 67.) Kelly had called an ambulance because Ward complained of injuries, (Kelly Dep. 99), and the ambulance arrived at 8:30, (Video at 20:30:33). The paramedics spoke with Kelly before addressing Ward. (Ward Dep. 20-21.) After watching Ward lift his arms, one of the paramedics told Ward "there is nothing wrong with you" and the paramedics left. (*Id.* 21.)

Ward claims that the incident exacerbated preexisting rotator cuff injuries and that his arms were improperly rotated when he was handcuffed. (*Id.* 16-17.) He treated his shoulder pain with ice and over the counter pain killers. (*Id.* 22.) He also claims emotional injuries of temporary trouble sleeping, anger, and nervousness. (*Id.* 17-18.) Earlier on the day of the incident, Ward had served as co-counsel in a deposition of another Minneapolis police officer that Ward believes was a partner of Morrison's. (Compl. ¶ 10.) Ward believes the incident occurred in part as retaliation for him asserting the rights of his client in the separate action. (*Id.*)

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   CONSTITUTIONAL CLAIMS

### A.   Qualified Immunity

The officers contend they are entitled to qualified immunity from Ward's federal claims. Qualified immunity shields government officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether to grant summary judgment on the basis of qualified immunity, the "court states the facts most favorably to the plaintiff[], discounting the [officers]' contrary evidence." *See Small v. McCrystal*, 708 F.3d 997, 1002 (8th Cir. 2013). The Court considers "(1) whether the facts alleged or shown, construed most favorably to the plaintiff[], establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Id.* at 1003. "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to

both of these questions." *Nelson v. Correctional Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009). In some cases, "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Thus, the Court has discretion to not address both prongs of the qualified immunity test in every case. *See id.* at 236-37.

### B.     The Fourth Amendment

Ward brings a claim entitled "excessive force and due process violations" pursuant to § 1983 against the officers. Ward does not develop his purported due process claim and the Court finds that the only constitutional amendment potentially implicated is the Fourth Amendment and its prohibition against unreasonable seizures. *See Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011) ("[T]he only provision properly invoked is the Fourth Amendment. Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." (internal quotation marks omitted)); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("**[A]ll** claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." (emphasis in original)).

The reasonableness of a seizure under the Fourth Amendment depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The reasonableness is judged from the perspective of a reasonable officer on the scene. *Id.* Because the reasonableness standard is objective as opposed to subjective, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." *Id.* at 397. For this reason, Ward's suspicion that the incident occurred because of his race or as retaliation for a deposition Ward took of another officer earlier in the day is largely irrelevant for purposes of this analysis.

The Court must analyze two separate potential Fourth Amendment violations. First, the fact that defendants handcuffed Ward and held him in a squad car could be unreasonable, regardless of how forcefully the defendants handled him. Second, even if the officers could constitutionally arrest and detain Ward, the amount of force they used in doing so could have been excessive and therefore unreasonable. The Court will address these issues in turn.

### 1. Unlawful Seizure

The Court finds that the officers did not violate the Fourth Amendment by arresting Ward and temporarily detaining him in Kelly's squad car. "[I]f an officer has probable cause to believe that an individual has committed **even a very minor criminal offense** in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (emphasis added). Here, Kelly had probable cause to believe that Ward had committed several minor

criminal offenses (e.g., (1) making a right turn into the middle lane without signaling the lane change in violation of Minn. Stat. § 169.19, subd. 1(a); (2) failing to signal multiple turns for the one hundred feet leading up to the turns in violation of Minn. Stat. § 169.19, subd. 5; and (3) failing to provide a driver's license when demanded by a peace officer in violation of Minn. Stat. § 171.08).  Because Kelly had probable cause to believe that Ward had committed several minor criminal offenses, Ward's arrest and temporary detention was not an unreasonable seizure in violation of the Fourth Amendment.

### 2. Excessive Force

Despite the Court's conclusion that it was constitutional to arrest and detain Ward, a Fourth Amendment violation could exist if the officers used excessive force in effectuating the arrest.  Here, the Court finds that even if Kelly or Hoffbeck used excessive force, they did not violate a clearly established constitutional right and are therefore entitled to qualified immunity.

As a general matter, "[t]he right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998).  The Court must determine, more specifically, whether it was clearly established at the time of the incident, that the officers' conduct, taking the facts in the light most favorable to Ward, violated the right to be free from excessive force.  *See Chambers*, 641 F.3d at 908 ("For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"

(alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). It is not necessary that the "very action in question has previously been held unlawful" so long as the unlawfulness of the officers' conduct was apparent in light of preexisting law. *Anderson*, 483 U.S. at 640. If the law at the time of the events in question gave the officers "fair warning" that their conduct was unconstitutional, qualified immunity will not be granted. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

As noted above, the objective reasonableness of a particular seizure is a fact-specific inquiry, *see Graham*, 490 U.S. at 396, and "not every push or shove violates the Fourth Amendment," *Guite*, 147 F.3d at 750. "The use of some force is reasonable when an arrestee disobeys orders." *Anderson v. City of Hopkins*, 805 F. Supp. 2d 712, 720 (D. Minn. 2011); *see also Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (concluding that pulling a driver from a vehicle and handcuffing him in response to the driver's refusal to exit the vehicle was not excessive force under the circumstances). Additionally, "[r]esistance may justify the use of greater force." *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1008 (8th Cir. 2003).

In the present case, Ward did not provide his license when Kelly requested it and he instead argued with Kelly about why he was pulled over. Ward then resisted Kelly's effort to open the vehicle's door and disobeyed Kelly's repeated requests for Ward to exit the vehicle. In response, Kelly pulled on Ward's arm to get him out of the car and on to his feet, then moved Ward toward the back of the vehicle where Hoffbeck and Kelly applied slight force to Ward's arms in order to place Ward in handcuffs. While it is unfortunate that any physical contact occurred in this situation, even viewing the facts in

the light most favorable to Ward, the Court finds that the officers did not have fair warning that the minimal force they used was excessive under the Fourth Amendment.

Additionally, Ward has not presented evidence that he suffered greater than de minimis injury. *See Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006) (concluding that "relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition" are de minimis injuries). The incident occurred in 2009 and the Eighth Circuit has held that prior to 2011, a reasonable officer making an arrest "could have believed that as long as he did not cause more than de minimis injury to an arrestee, his actions would not run afoul of the Fourth Amendment." *Chambers*, 641 F.3d at 908.

For these reasons, the Court finds that even if the officers' force was excessive given the circumstances, no reasonable jury could find that it was clearly established that their conduct was unconstitutional. Therefore, defendants are entitled to qualified immunity on Ward's § 1983 claims that are premised on Fourth Amendment violations.

### C. Failure to Prevent Constitutional Violations

Ward also brings a claim entitled "Failure to Prevent Violations of 42 USC Section[] 1983." (Compl. ¶¶ 59-62.) Ward's brief makes clear that the claim is brought pursuant to 42 U.S.C. § 1986, which creates liability if a person knows of a conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985, has the power to prevent the wrong, and neglects to do so. *See* 42 U.S.C. § 1986. At oral argument, however, Ward

conceded his § 1985 conspiracy claim, and his § 1986 claim for failure to prevent violations of § 1985 therefore must fail.

The Court also notes that had Ward not conceded his § 1985 conspiracy claim, the Court would have granted defendants' motion for summary judgment on the claim. Ward's complaint suggests that the claim is premised on his belief that the officers, particularly Kelly and Morrison, targeted him based on his race. (Compl. ¶ 46.) Ward's brief appears to suggest that the claim is also premised on Ward's belief that he was targeted because he participated in a deposition of another police officer in an unrelated case on the day of the incident. Regardless of the claim's premise, it is too speculative to survive summary judgment. Although a conspiracy may be established on solely circumstantial evidence, *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008), "[s]peculation and conjecture are not enough to prove a conspiracy exists," *Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999). While Ward's allegations raise a troubling specter of racial profiling, he has produced no evidence that would allow a reasonable inference that the officers agreed to target him for the purposes he suggests.

Ward's failure to prevent claim could also be interpreted as being brought pursuant to § 1983 for failing to prevent Fourth Amendment violations, as opposed to failing to prevent a § 1985 conspiracy. It is "clearly established that an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment." *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009). However, the Court concluded above that the minimal force used in the present case did not run afoul of a clearly established constitutional right. It would be

incongruous to conclude that an officer violates a clearly established constitutional right by failing to prevent another officer's use of force when the underlying use of force does not, in itself, violate a clearly established constitutional right. Thus, regardless of how the Court interprets Ward's failure to prevent claim, the Court finds that defendants are entitled to summary judgment.

## III.   STATE TORT CLAIMS

Ward brings a number of state tort claims in addition to his federal claims. The individual defendants assert that the intentional tort claims asserted against them must be dismissed because none were served within the two-year statute of limitations for intentional tort claims. *See* Minn. Stat. § 541.07(1). The Court agrees and will grant summary judgment for the individual defendants on that basis,[3] but the Court must address the merits of the tort claims nonetheless because the City of Minneapolis was timely served and it is potentially vicariously liable for the torts of its officers. *See* Minn. Stat. § 466.02. For the reasons explained below, the Court finds that the officers would have been protected by official immunity had they been timely served, and the City of Minneapolis is therefore entitled to summary judgment. *Watson ex rel. Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 414 (Minn. 1996) ("If official immunity protects the government employee . . . from suit, the government entity will not be liable for its employee's torts . . . .").

---

[3] Ward's claim for negligent infliction of emotional distress is not subject to the two-year statute of limitations. *See* Minn. Stat. § 541.05, subd. 1(5). Defendants explicitly do not include this claim in their statute of limitations argument.

Official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong." *Rico v. State*, 472 N.W.2d 100, 106-07 (Minn. 1991). "Generally, police officers are classified as discretionary officers entitled to that immunity." *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990). The purpose of official immunity is to ensure that officers can "perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment." *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006).

The exception for willful and malicious conduct applies only when an officer knows or has reason to know he or she is doing something illegal:

> The defendant must have reason to know that the challenged conduct is prohibited. The exception does not impose liability merely because an official intentionally commits an act that a court or a jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited.

*Rico*, 472 N.W.2d at 107 (emphasis omitted). Willful and malicious are considered synonymous in this context, *see id.*, and "[w]hether or not an officer acted maliciously or willfully is usually a question of fact to be resolved by a jury," *Morris*, 453 N.W.2d at 42.

**A.     Battery**

A battery is "an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980). Police officers, however, have statutory authority to come into contact with a person without his or her consent when making a lawful arrest. *See* Minn. Stat. § 609.06, subd. 1(1)(a). The statute allows

the use of "reasonable force" when the officer "reasonably believes" that he or she is making a lawful arrest. *Id.* Therefore, in order to successfully make a battery claim against an officer, a plaintiff must establish that the physical contact was unreasonable, not merely that it was non-consensual. *Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984) ("[T]he unreasonableness of the force used is an element of the action and the burden of proving such unreasonableness is on plaintiff.").

For the same reasons that the Court found that the officers are entitled to qualified immunity on Ward's excessive force claim, it finds that they are entitled to official immunity on Ward's battery claim. No reasonable factfinder could conclude that the officers had "reason to believe," *Rico*, 472 N.W.2d at 107, that the minimal force they applied to Ward in the present case amounted to battery given Ward's failure to follow multiple orders.

### B. Assault

An assault is an unlawful threat to do harm made by one having the present ability to carry out the threat. *See Morris*, 453 N.W.2d at 41; *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939). The threat must create in the plaintiff a "reasonable apprehension of immediate bodily harm." *Dahlin*, 288 N.W. at 852. "The use of threatened force by a peace officer is lawful if it is a reasonable use of force when used in affecting an arrest." *Morris*, 453 N.W.2d at 41. The Court finds that defendants are entitled to summary judgment on Ward's assault claim because Ward has not identified a threat to do harm

made by any defendant. The only defendant that warrants further discussion is Morrison, to whom Ward refers specifically in the complaint and in his brief.

While the video does show Morrison appearing to yell angrily at Ward while standing very close to him, Ward does not allege that Morrison threatened him. Rather, Ward alleges that Morrison asked "What are you shouting for" and that Morrison was "agitated like he was spoiling for a fight." And Morrison testified that he told Ward to "quit acting like a baby." Even if Morrison's shouting somehow amounted to a threat, and even if it was reasonable for Ward to fear bodily harm based on Morrison's apparent frustration, the Court finds that Morrison would be protected by official immunity. Morrison did not explicitly threaten Ward with harm and instead was urging Ward to comply with the officers' orders because it was a "simple traffic stop." Although the Court questions whether Morrison's angry shouting served any useful purpose, no reasonable factfinder could find that Morrison had reason to know that he was committing an assault.

### C. False Arrest

An officer may make a warrantless arrest for a "public offense" committed in his or her presence. *Morris*, 453 N.W.2d at 36; Minn. Stat. § 629.34, subd. 1. Minor traffic violations are public offenses. *See State v. Sellers*, 350 N.W.2d 460, 462 (Minn. Ct. App. 1984). The Court's conclusion above that Kelly had probable cause to believe that Ward had committed a variety of minor criminal offenses is dispositive of Ward's false arrest claim. *See Morris*, 453 N.W.2d at 36 ("[B]ecause [the officer] had probable cause to

arrest, [plaintiff] has no claim for false arrest or false imprisonment."). Therefore, the Court grants the motion for summary judgment on the false arrest claim.

### D. Intentional Infliction of Emotional Distress (IIED) and Negligent Infliction of Emotional Distress (NIED)

IIED contains four elements: (1) extreme and outrageous conduct; (2) done intentionally or recklessly; (3) the conduct causes emotional distress; and (4) the distress is severe. *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003). A plaintiff alleging NIED must establish the four elements of a typical negligence claim (i.e., duty, breach, causation, and harm), and also three additional elements: (1) that the plaintiff was within the zone of danger of physical impact created by the defendant's negligence; (2) that the plaintiff reasonably feared for her own safety; and (3) that the plaintiff suffered severe emotional distress with attendant physical manifestations. *Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005).

The Court finds that Ward's IIED and NIED claims both fail because Ward has not presented evidence of sufficiently severe distress, among other reasons. Under Minnesota law, "'the law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it.'" *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983) (alteration omitted) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). Ward testified that he suffered from nightmares in the nights following the incident, fear and nervousness being around police officers, and anger. Minnesota courts have rejected IIED claims with evidence of distress that was at least as severe, if not more severe, than Ward's. *See, e.g.*, *Elstrom v. Indep. Sch. Dist. No. 270*,

533 N.W.2d 51, 57 (Minn. Ct. App. 1995) ("[Plaintiff] suffered insomnia, crying spells, a fear of answering her door and telephone, and depression, which caused her to seek treatment. This does not state a valid [IIED or NIED] claim."). Thus, the Court finds that defendants are entitled to summary judgment on Ward's IIED and NIED claims.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Joint Motion for Summary Judgment [Docket No. 13] is **GRANTED** and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: July 26, 2013              s/ John R. Tunheim
at Minneapolis, Minnesota.            JOHN R. TUNHEIM
                                                 United States District Judge